IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

JIM DAVID, JR., Administrator of
Estate of James David, Sr., et al.,

                    Plaintiffs,             Case No. 3:13 cv 2553

      -vs-

                                   MEMORANDUM  OPINION

CITY OF BELLEVUE, OHIO,
et al.,

                    Defendants.

KATZ, J.

Jim David Jr., as administrator of the Estate of James David Sr. ("Mr. David"), and Karen David, Mr. David's wife, sued the City of Bellevue, Ohio, Sergeant Jeffrey Matter, and Patrolman Erik Lawson.  Sergeant Matter and Patrolman Lawson were employed by the City of Bellevue. Plaintiffs alleged that the Defendants:  1) violated Mr. David's Fourth and Fourteenth Amendment rights pursuant to 42 U.S.C. § 1983 (Count I); 2) Mr. David was shot and killed by the Defendants, causing conscious pain and suffering, resulting in damages to his next-of-kin pursuant to Ohio Rev. Code § 2125.02 (Count II); and 3) Defendants Lawson and Matter negligently inflicted emotional distress on Mrs. David (Count III).  (Doc. No. 87).

Defendants have moved for summary judgment pursuant to Federal Rule of Civil Procedure 56.  (Doc. No. 97).  Plaintiffs have filed a response (Doc. No. 120), and Defendants have filed a reply.  (Doc. No. 122).  Defendants have also filed:  1) a motion to strike the filing of the reports of Plaintiffs' experts; and 2) a notice of supplemental authority.  (Doc. Nos. 124, 125). Plaintiffs have filed their responses (Doc. Nos. 126, 127), and Defendants have filed their replies. (Doc. Nos. 128, 129).

I.  Jurisdiction and Venue

The Court finds that it has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1343, and 1367.  Venue is also properly before the Court.  *See* 28 U.S.C. § 1391; N.D. Ohio R. 3.8.

## II.  Motion to Strike

Defendants have moved to strike Plaintiffs' notice regarding the filing of their expert reports with declarations.  Defendants contend that Plaintiffs improperly relied upon unsworn and unauthenticated expert reports in their reply to the motion for summary judgment.  As a result, Plaintiffs filed the notice to correct their error.  Defendants contend that the Plaintiffs failed to properly move the Court to submit the reports in accordance with Federal Rule of Civil Procedure 56(e).  Defendants argue that to the extent Plaintiffs want to supplement their brief in opposition to the motion for summary judgment, the Plaintiffs should have filed the appropriate motion rather than unilaterally filing the declarations.  (Doc. No. 124, pp. 1–2).

In addition, Defendants move to strike or limit paragraph three of the declarations of Dr. Michael Lyman and Mr. David Balash.  Defendants note that a witness cannot offer an affidavit contradicting prior deposition testimony without an explanation, citing *Aerel, S.R.L. v. PCC Airfoils, L.L.C.*, 448 F.3d 899, 908–09 (6th Cir. 2006).  Defendants state that because no such explanation is offered in the declarations, the Court should strike paragraph three in each of the declarations.  In the alternative, Defendants request the Court accept paragraph three subject to any limiting statements contained in the experts' depositions.  (Doc. No. 124, p. 2).

Plaintiffs state their filing was to correct a simple clerical error.  They note that courts frequently permit the filing of an affidavit affirming the contents of an expert report to cure the technical deficiency of an unsworn report.  Plaintiffs state they properly disclosed the reports to

Defendants pursuant to Federal Rule of Civil Procedure 26 and the reports should not be excluded for a mere technical deficiency. Plaintiffs state should the Court find their notice to be inadequate, they will "happily comply" with any procedural measures necessary for the reports and declarations to be made a part of the record. (Doc. No. 126, p. 1).

Plaintiffs further request Defendants' motion to strike paragraph three of the declarations be denied. Plaintiffs state the Court need not strike any portion of the declarations because the experts elaborated or explained the opinions in their reports as contemplated by Rule 26. (Doc. No. 126, p. 2).

The dispute between the parties is simply that Plaintiffs should have moved the Court to file the declarations rather than filing the documents with a notice. The deficiency could be easily corrected by allowing the Plaintiffs to refile the documents as a motion, rather than as a notice. However, this procedure would cause an unnecessary cost and delay to the parties. Plaintiffs' error is harmless. The motion to strike is denied. Regarding paragraph three in the declarations, the motion to strike is also denied and the Court will evaluate the paragraphs in light of the respective depositions and reports.

The Court further notes Defendants have argued that the expert reports by Dr. Lyman and Mr. Balash cannot be considered as they are unsworn and constitute hearsay. The Sixth Circuit has held that a district court may not consider unsworn, hearsay evidence in deciding whether or not to grant a motion for summary judgment. *Sigler v. Am. Honda Motor Co.*, 532 F.3d 469, 480–81 (6th Cir. 2008); *Pack v. Damon Corp.*, 434 F.3d 810, 815 (6th Cir. 2006). Although the reports themselves are not sworn, each expert subsequently incorporated his respective reports into an attached affidavit. The incorporation of the reports by reference into the affidavits now

3

allows the Court to consider the reports in deciding the current motion for summary judgment.

*See Laws v. Stevens Transp., Inc.*, No. 2:12-cv-544, 2013 WL 4510395, at *7 (S.D. Ohio Aug. 23, 2013); *see e.g., Sigler*, 532 F.3d at 480–81; *Pack*, 434 F.3d at 815.

## III.  Facts

The following facts are undisputed.  The case concerns the fatal shooting of Mr. David by City of Bellevue Police Officers Sergeant Jeffrey Matter and Patrolman Erik Lawson on September 22, 2010.  Shortly after arriving on shift at 10:00 p.m., Sergeant Matter and Patrolman Lawson were advised by Bellevue dispatch that an individual had called regarding a man with a gun.  (Doc. No. 100, Lawson Dep. at 81–82, 91–92 ).  The officers were dispatched to 213 Greenwood Heights Boulevard in Bellevue in response to the call.

### A.  Arrival of Officers

Patrolman Lawson was the first person to arrive on the scene.  (Doc. No. 100, Lawson Dep. at 93).  He parked his cruiser in the driveway of 213 Greenwood Heights Boulevard.  (Doc. No. 100, Lawson Dep. at 94).  Patrolman Lawson could not remember whether he used his overhead lights or siren to respond to the call.  (Doc. No. 100, Lawson Dep. at 94).  Patrolman Lawson spoke with James Armstrong, the individual who had called the police.  (Doc. No. 100, Lawson Dep. at 93).  Mr. Armstrong had several interactions with the police in the past for domestic issues and drugs.  (Doc. No. 100, Lawson Dep. at 87–89).  The officers admit that Mr. Armstrong was known to be an aggressor in various situations.  (Doc. No. 100, Lawson Dep. at 103).

Mr. Armstrong claimed a man had been standing across the street staring at him.  (Doc. No. 100, Lawson Dep. at 96).  Patrolman Lawson advised Mr. Armstrong the individual's activity

4

was not illegal.  (Doc. No. 100, Lawson Dep. at 96).  Mr. Armstrong then stated the man had

pulled a gun and made the motion of cocking the receiver and loading a bullet into the chamber.

(Doc. No. 100, Lawson Dep. at 96–97).  Patrolman Lawson asked Mr. Armstrong where the man

was located.   (Doc. No. 100, Lawson Dep. at 97).  Mr. Armstrong pointed through his backyard

and a neighboring backyard to the front porch of 314 Union Street.  (Doc. No. 100, Lawson Dep.

at 97).  Patrolman Lawson could see what appeared to be an individual on the porch, but his view

was obscured by a tree at the end of the porch.  (Doc. No. 100, Lawson Dep. at 99).  Patrolman

Lawson spoke with other individuals who were present and confirmed that the man had a gun.

(Doc. No. 100, Lawson Dep. at 101–03).

Sergeant Matter arrived as Patrolman Lawson was speaking with Mr. Armstrong.  (Doc.

No. 99, Matter Dep. at 93).  Sergeant Matter parked his vehicle on Greenwood Heights Boulevard

in front of the Armstrong residence.  (Doc. No. 99, Matter Dep. at 93).  Sergeant Matter stated he

did not use his overhead lights or his siren.  (Doc. No. 99, Matter Dep. at 103).

Sergeant Matter got out of his vehicle and met Patrolman Lawson in the driveway of the

Armstrong residence.  (Doc. No. 99, Matter Dep. at 93).  Patrolman Lawson summarized his

discussion with Mr. Armstrong and stated that Mr. Armstrong had seen a man with a gun who had

appeared to have chambered a round in the gun.  (Doc. No. 99, Matter Dep. at 93–94).  Patrolman

Lawson indicated to Sergeant Matter where the individual was located.  (Doc. No. 99, Matter Dep.

at 94).  The officers wanted to speak with Mr. David to obtain his side of the events.  (Doc. No.

100, Lawson Dep. at 106).

As the officers had a clear line of sight to 314 Union Street, the officers chose to walk

through the backyards of 213 Greenwood Heights and its neighboring property to arrive on Union

Street.  (Doc. No. 99, Matter Dep. at 147; Doc. No. 100, Lawson Dep. at 107).  The officers

crossed the street to 314 Union Street where a man, later identified as Mr. David, was sitting on

the porch.  (Doc. No. 100, Lawson Dep. at 108, 173).  Both officers testified they had their

flashlights turned on and their weapons drawn in a low ready position.  (Doc. No. 99, Matter Dep.

at 108; Doc. No. 100, Lawson Dep. at 109–10).  The officers were not familiar with 314 Union

Street and did not know Mr. David.  (Doc. No. 99, Matter Dep. at 83; Doc. No. 100, Lawson Dep.

at 81).

### B.  Confrontation with Mr. David

As the officers crossed the public sidewalk, Patrolman Lawson and Sargent Matter

approached the porch where Mr. David was sitting in different directions.  (Doc. No. 100, Lawson

Dep. at 115).  When the officers were within ten to fifteen feet of the porch, Patrolman Lawson

testified that he began to introduce himself, stating:  "Good evening, sir.  I'm Officer Lawson,

Bellevue Police Department.  I am responding to . . . ."  (Doc. No. 100, Lawson Dep. at 116).  At

this point, Mr. David stood up from his chair and walked towards the front door of the residence.

(Doc. No. 100, Lawson Dep. at 118).  Patrolman Lawson called "Sir," at which time Mr. David

stopped walking and turned around to face Patrolman Lawson.  (Doc. No. 100, Lawson Dep. at

119–20).  When Mr. David turned around, Sergeant Matter and Patrolman Lawson saw a gun in

Mr. David's right hand.  (Doc. No. 99, Matter Dep. at 96; Doc. No. 100, Lawson Dep. at 122).

Sargent Matter saw Mr. David raise his gun and advance towards Patrolman Lawson, with his gun

pointed in Patrolman Lawson's direction.  (Doc. No. 99, Matter Dep. at 96).

Patrolman Lawson also testified that Mr. David allegedly raised his right arm and pointed

the gun at him.  (Doc. No. 100, Lawson Dep. at 122–23).  Patrolman Lawson "yelled, Gun" and

both officers began firing their weapons. (Doc. No. 99, Matter Dep. at 96; Doc. No. 100, Lawson Dep. at 123). Patrolman Lawson fired sixteen rounds while Sergeant Matter fired eight rounds. (Doc. No. 99, Matter Dep. at 213; Doc. No. 100, Lawson Dep. at 124).

The officers testified that at the conclusion of the shooting, Mr. David was kneeling in front of a chair on the front porch. (Doc. No. 99, Matter Dep. at 129). Sergeant Matter confirmed with Patrolman Lawson that he was fine. (Doc. No. 99, Matter Dep. at 97). Sergeant Matter radioed dispatch, requested an ambulance, and then went to check on Mr. David. (Doc. No. 99, Matter Dep. at 97). Upon going up to the porch, Sergeant Matter moved the gun away from Mr. David and found that he was not breathing. (Doc. No. 99, Matter Dep. at 97).

### C. Post-shooting Events

Sergeant Matter stated he heard a noise behind him and swung around to find Mrs. David coming out of the door behind him. (Doc. No. 99, Matter Dep. at 97). Sergeant Matter ordered Mrs. David to return to the house and completed his check of Mr. David. (Doc. No. 99, Matter Dep. at 98).

Sergeant Matter and Patrolman Lawson secured Mr. David's gun and confirmed there was a round in the chamber. The officers removed the bullets from the gun, placed the weapon in an evidence bag, and then locked the gun in the trunk of Patrolman Lawson's police cruiser. (Doc. No. 100, Lawson Dep. at 129–30). The ambulance arrived to attend to Mr. David. (Doc. No. 100, Lawson Dep. at 132). Bellevue Police Captain Matthew Johnson arrived on scene and spoke with Patrolman Lawson. (Doc. No. 100, Lawson Dep. at 158). Captain Johnson had requested that dispatch contact the Ohio Bureau of Criminal Investigation and Identification (BCI) for assistance. (Doc. No. 102, Johnson Dep. at 44). BCI agents arrived and processed the scene. (Doc. No. 101,

7

Brandal Dep. at 30). BCI investigated the incident and conducted interviews. BCI ultimately determined that Mr. David pointed a gun at the officers and the officers properly responded with the use of deadly force. The matter was presented to a state grand jury and no bill was returned. (Doc. No. 100, Lawson Dep. at 65). After reviews by both BCI and the City of Bellevue, the officers were returned to active duty with no disciplinary action.

## IV. Summary Judgment Standard

Summary judgment is proper where "there is no genuine dispute as to any material fact" and the moving party "is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A party asserting a genuine issue of material fact must support the argument either by "citing to particular parts of materials in the record" or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1). A court views the facts in the record and reasonable inferences which can be drawn from those facts in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986). A court does not weigh the evidence or determine the truth of any matter in dispute. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249 (1986).

The party requesting summary judgment bears an initial burden of demonstrating that no genuine issue of material fact exists, which the party must discharge by producing evidence to demonstrate the absence of a genuine issue of material fact or "by showing . . . that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323–25 (1986) (internal quotation marks omitted). If the moving party satisfies this burden, the nonmoving party "may not rest upon its . . . pleadings, but rather must set forth specific facts

showing that there is a genuine issue for trial." *Moldowan v. City of Warren,* 578 F.3d 351, 374

(6th Cir. 2009) (citing Rule 56 and *Matsushita,* 475 U.S. at 586). The party opposing the

summary judgment motion must present sufficient probative evidence supporting its claim that

disputes over material facts remain; evidence which is "merely colorable" or "not significantly

probative" is insufficient. *Anderson,* 477 U.S. at 248–52.

## V. Constitutional Claims

In Count I of their amended complaint, Plaintiffs alleged that Sergeant Matter and

Patrolman Lawson violated Mr. David's Fourth and Fourteenth Amendment rights. (Doc. No. 87,

p. 7, ¶ 46).

### A. *Fourteenth Amendment*

In order to state a Fourteenth Amendment claim, Plaintiffs must have been a pretrial

detainee at the time of his injuries. *Aldini v. Johnson*, 609 F.3d 858, 864–67 (6th Cir. 2010). In

explaining how a court must examine a claim under the Fourth Amendment versus the Fourteenth

Amendment, the Sixth Circuit stated:

> A plaintiff has a substantially higher hurdle to overcome to make a showing
> of excessive force under the Fourteenth Amendment as opposed to under the
> Fourth Amendment. *Darrah v. City of Oak Park*, 255 F.3d 301, 306 (6th Cir.
> 2001). Under the Fourth Amendment, we apply an objective reasonableness test,
> looking to the reasonableness of the force in light of the totality of the
> circumstances confronting the defendants, and not to the underlying intent or
> motivation of the defendants. *Dunigan v. Noble*, 390 F.3d 486, 493 (6th Cir.
> 2004); *see also Graham*, 490 U.S. at 396–97, 109 S. Ct. 1865. We balance "the
> nature and quality of the intrusion on [a plaintiff's] Fourth Amendment interests
> against the countervailing governmental interests at stake." *Ciminillo v. Streicher*,
> 434 F.3d 461, 466–67 (6th Cir. 2006). In doing so, three factors guide our analysis:
> " '[ (1) ] the severity of the crime at issue, [ (2 ] whether the suspect poses an
> immediate threat to the safety of the officers or others, and [ (3) ] whether he is
> actively resisting arrest or attempting to evade arrest by flight.' " *Martin v. City of
> Broadview Heights*, 712 F.3d 951, 958 (6th Cir. 2013) (quoting *Graham*, 490 U.S.
> at 396, 109 S. Ct. 1865). These factors are assessed from the perspective of a

9

reasonable officer on the scene making a split-second judgment under tense, uncertain, and rapidly evolving circumstances without the advantage of 20/20 hindsight. *Graham*, 490 U.S. at 396–97, 109 S. Ct. 1865.

In contrast, with a Fourteenth Amendment claim, we consider whether the defendant's conduct "shocks the conscience" so as to amount to an arbitrary exercise of governmental power. *Darrah*, 255 F.3d at 306 (citing *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 845–46, 851–53, 118 S. Ct. 1708, 140 L. Ed. 2d 1043 (1998)). This standard differs depending on the factual circumstances. *See id.* Where defendants are "afforded a reasonable opportunity to deliberate . . . their actions will be deemed conscience-shocking if they were taken with 'deliberate indifference' towards the plaintiff's federally protected rights." *Claybrook v. Birchwell*, 199 F.3d 350, 359 (6th Cir. 2000) (citing *Lewis*, 523 U.S. at 851–52, 118 S. Ct. 1708). If, however, the incident was a "rapidly evolving, fluid, and dangerous predicament," the plaintiff must show that the defendant acted "'maliciously and sadistically for the very purpose of causing harm' rather than 'in a good faith effort to maintain or restore discipline.'" *Id.* (quoting *Lewis*, 523 U.S. at 853, 118 S. Ct. 1708).

Notwithstanding the Due Process Clause's broader applicability, we remain cognizant of the fact that "if a constitutional claim is covered by a specific constitutional provision, such as the Fourth or Eighth Amendment, the claim must be analyzed under the standard appropriate to that specific provision, not under the rubric of substantive due process." *United States v. Lanier*, 520 U.S. 259, 272 n. 7, 117 S. Ct. 1219, 137 L. Ed. 2d 432 (1997) (citing *Graham*, 490 U.S. at 394, 109 S. Ct. 1865).

*Burgess v. Fischer*, 735 F.3d 462, 472–73 (6th Cir. 2013).

*Burgess* noted that until *Aldini*, the Sixth Circuit had never addressed how far the Fourth Amendment protection extended beyond the individual's transfer of custody from the arresting officer to jail authorities. *Id.* at 474. The court noted that the "Fourth Amendment extends at least through the completion of the booking procedure, which is typically handled by jailers." *Id.* (internal quotation marks and citations omitted). In finally determining where the Fourth Amendment ended and the Fourteenth Amendment began, the Sixth Circuit held that "the dividing line between the Fourth and Fourteenth Amendment zones of protection [is at] the probable cause hearing for warrantless arrests." *Id.*; *Aldini*, 609 F.3d at 867. As *Aldini* and *Burgess* explicitly provide that the Fourteenth Amendment does not apply because Mr. David was not a pretrial

10

detainee at the time of his death, summary judgment is granted to the Defendants on Plaintiffs'
Fourteenth Amendment claim.

B.  *Fourth Amendment*

*Aldini* and *Burgess* require that the proper analysis of Plaintiffs' federal claim must be
under the Fourth Amendment.  The Fourth Amendment has an objective reasonableness test.  The
Court looks at the reasonableness of the officers' actions in light of the totality of the
circumstances that were confronting the officers, and not to the underlying intent or motivation of
the officers.  *Burgess*, 735 F.3d at 472; *Dunigan v. Noble*, 390 F.3d 486, 493 (6th Cir. 2004); *see
also Graham v. Connor*, 490 U.S. 386, 396–97 (1989).  The Court balances "the nature and
quality of the intrusion on [a plaintiff's] Fourth Amendment interests against the countervailing
governmental interests at stake."  *Ciminillo v. Streicher*, 434 F.3d 461, 466–67 (6th Cir. 2006).
The reasonableness of the Defendants' actions are assessed from the perspective of a reasonable
officer on the scene, rather than with the advantage of 20/20 hindsight.  *Graham*, 490 U.S. at
396–97.

VI.  Qualified Immunity Requirements

The officers have invoked the defense of qualified immunity which, if it applies, is a
defense not just against liability, but against suit itself.  *Pearson v. Callahan*, 555 U.S. 223, 231
(2009).  Thus, the immunity question should be resolved as early in the litigation process as
possible.  *Id*.

Qualified immunity shields government officials from liability for civil damages if their
actions did not violate clearly established statutory or constitutional rights of which a reasonable
person would have known.  *Id*.  Qualified immunity ordinarily applies unless it is obvious that no

11

reasonably competent official would have concluded that the actions were unlawful. *Ewolski v. City of Brunswick*, 287 F.3d 492, 501 (6th Cir. 2002).  Qualified immunity "'gives ample room for mistaken judgments' by protecting 'all but the plainly incompetent or those who knowingly violate the law.'" *Hunter v. Bryant*, 502 U.S. 224, 229 (1991) (quoting *Malley v. Briggs*, 475 U.S. 335, 343, 341 (1986)).  Qualified immunity applies irrespective of whether the official's error was a mistake of law or a mistake of fact, or a mistake based on mixed questions of law and fact. *Pearson*, 555 U.S. at 231.

### A. Burden of Proof

The plaintiff bears the burden of showing that defendants are not entitled to qualified immunity.  *Untalan v. City of Lorain*, 430 F.3d 312, 314 (6th Cir. 2005).  A plaintiff must show both that, viewing the evidence in the light most favorable to him, a constitutional right was violated and that the right was clearly established at the time of the violation.  *Scott v. Harris*, 550 U.S. 372, 377 (2007); *Harrison v. Ash*, 539 F.3d 510, 517 (6th Cir. 2008).  If the plaintiff fails to show either that a constitutional right was violated or that the right was clearly established, he will have failed to carry his burden.  Further, to satisfy the second prong of the standard, the plaintiff must show that the right was clearly established in a "particularized sense," such that a reasonable officer confronted with the *same* situation would have known that using deadly force would violate that right.  *Brosseau v. Haugen*, 543 U.S. 194, 199–200 (2004) (internal quotation marks and citation omitted).  In determining whether the required showing has been made, a court has discretion to decide which of the two elements to address first.  *Pearson*, 555 U.S. at 236.

### B. Use of Deadly Force

It is axiomatic that individuals have a constitutional right not to be subjected to excessive force during an arrest, investigatory stop, or other "seizure." *Graham*, 490 U.S. at 388, 395. It is not for this Court to substitute its own notion of the "proper police procedure for the instantaneous decision of the officer at the scene." *Boyd v. Baeppler*, 215 F.3d 594, 602 (6th Cir. 2000) (internal quotation marks and citations omitted). "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 396–97.

Regarding the constitutionality of an officer's use of deadly force, which is also subject to the objective reasonableness standard of the Fourth Amendment, the Supreme Court has noted that the use of deadly force is reasonable only if "the officer has probable cause to believe that the suspect poses a significant threat of death or serious physical injury to the officer or others." *Tennessee v. Garner*, 471 U.S. 1, 3 (1985). Thus, Plaintiffs' excessive force claim requires a showing that the officers' use of deadly force was objectively unreasonable.

### C. *Reasonableness of Officers' Actions*

At the summary judgment stage, once the relevant facts are determined and all reasonable inferences are drawn in favor of a plaintiff, to the extent supported by the record, the question whether an officer's actions were objectively unreasonable is "a pure question of law." *Scott v. Harris*, 550 U.S. 372, 381 n. 8 (2007); *Dunn v. Matatall*, 549 F.3d 348, 353 (6th Cir. 2008).

### D. *Adequacy of Verbal Warning*

13

Plaintiffs state there is a dispute regarding whether Patrolman Lawson announced himself as the officers approached the David home.  Patrolman Lawson attested that he announced himself to Mr. David.  However, Sergeant Matter, who was only a few feet away from Patrolman Lawson, could not hear what was said.  (Doc. No. 120, p. 8).  Sergeant Matter testified he heard Patrolman Lawson say something to Mr. David which sounded like Patrolman Lawson was beginning to introduce himself.  (Doc. No. 120, p. 8 & n.14).  Several of the neighbors who were deposed failed to hear Patrolman Lawson announce himself.  (Doc. No. 120, pp. 8–13 & n.15).

Plaintiffs assert the only way Mr. David would have known there were two law enforcement officers standing in his yard was by listening to whatever Patrolman Lawson had said.  Because Sergeant Matter could not understand what was said, there is a question regarding whether Patrolman Lawson even made an announcement.  This question of fact therefore prevents the grant of summary judgment to the Defendants.  (Doc. No. 120, p. 8 & n.16).

Plaintiffs concede that although deadly force is authorized where a suspect poses a risk of serious harm, the Supreme Court has held that a warning is necessary when such a warning is feasible.  *Garner*, 471 U.S. at 11–12 ("if the suspect threatens the officer with a weapon . . . deadly force may be used if necessary to prevent escape, and if, where feasible, some warning has been given."); *see also Bouggess v. Mattingly*, 482 F.3d 886, 892 (6th Cir. 2007).

Plaintiffs state the lack of an adequate warning is important to the denial of summary judgment.  They argue the officers' "complete failure to communicate" constituted a failure to warn Mr. David, rendering the officers' decision to use deadly force unreasonable.  Plaintiffs state the officers missed numerous opportunities to warn Mr. David regarding who they were and what they wanted him to do.  The officers also failed to warn Mr. David that they would use force if he

14

did not comply with their commands. In fact, Plaintiffs state the officers gave Mr. David only one instruction, "Stop," which he actually followed.

Plaintiffs note that Police Chief Dennis Brandal admitted that it was feasible for the officers to drive a cruiser around in front of Mr. David's residence to use as a cover and to announce their identity as police officers. He also agreed that the officers had the ability to flip a switch to turn on their lights and sirens, which would have warned Mr. David that police were present. Chief Brandal also noted that the officers could have called the David residence on the telephone to warn that the police were investigating the situation. (Doc. No. 101, Brandal Dep. 57–62). These were all options which the officers could have exercised, but did not.

Rather, the officers approached the David house while concealing their identities with their flashlights. Although Patrolman Lawson states he identified himself as he approached the house, his words were unintelligible to a witness near the scene. Sergeant Matter, who was only a few feet away from Patrolman Lawson, testified that he could not understand what Patrolman Lawson was saying, attesting: "It sounded to me like he was — I couldn't hear his words, but it sounded like he was starting to introduce himself by the cadence of his voice and kind of the tone." (Doc. No. 99, Matter Dep. at 95). Close neighbors also testified that they did not hear the announcement, even though some of their windows were open.

When Mr. David stood and attempted to go inside, Plaintiffs argue that the officers had an opportunity to issue a warning by identifying themselves as the police and by giving a command. Patrolman Lawson said only, "Sir." Sergeant Matter said nothing. Finally, when Mr. David turned around and Patrolman Lawson saw the gun, he had yet another opportunity to warn Mr.

David or give him a command to drop his weapon. Yet, he failed to do so. Instead, he yelled, "Gun" and fired sixteen times at Mr. David.

Defendants argue that the application of a segmenting analysis precludes consideration of any errors made by the officers that brought on the need for force. (Doc. No. 97-1, pp. 11–13). Plaintiffs counter, stating segmenting does not always prevent courts from taking into account an officer's own reckless actions in deciding whether the ultimate use of force was reasonable under the circumstances. *Kirby v. Duva*, 530 F.3d 475, 482 (6th Cir. 2008) (noting that where an "officer unreasonably places himself in harm's way, his use of deadly force may be deemed excessive").

Plaintiffs assert the officers' failure to warn should be taken into consideration in deciding the overall reasonableness of their use of force. Because a jury could find that a warning was feasible before the officers began firing their weapons, summary judgment should be denied.

### E.  Issue of Whether Warning was Given

Plaintiffs further contend that Patrolman Lawson and Sergeant Matter are not entitled to qualified immunity because the law has long been clearly established that a warning must be given where feasible before deadly force may be used. *Garner*, decided in 1985, was sufficient to place the officers on notice of the warning requirement. *Garner*, 471 U.S. at 11–12. Further, the facts of *Dickerson v. McClellan*, 101 F.3d 1151, 1163–64 (6th Cir. 1996), decided by the Sixth Circuit in 1996, were similar enough to this case to place the officers on notice of the duty to warn prior to using deadly force.

Although the Plaintiffs rely heavily on the fact that Sergeant Matter was unable to understand Patrolman Lawson, or that neighbors failed to hear Patrolman Lawson make his

16

announcement, this does not create an issue of material fact which would prevent the grant of summary judgment to the Defendants. This issue was addressed by the Sixth Circuit in *Chappell v. City of Cleveland*, 585 F.3d 901, 913–14 (6th Cir. 2009). In *Chappell*, the officers used deadly force in response to an individual wielding a knife who had emerged from a closet in the home they were searching. The plaintiff alleged there was a question of whether the victim knew the individuals in the house were police officers.

The Sixth Circuit reversed the district court's denial of qualified immunity to the police officers. The court addressed the alleged dispute over whether the officers had announced themselves. The officers testified that they announced themselves several times. *Chappell*, 585 F.3d at 913–14. Two police officers and a witness, who were stationed nearby, but outside the house during the search, denied hearing the announcement. *Id*. at 913. The court held:

> This discrepancy, the district court reasoned, created a genuine factual dispute as to whether the detectives identified themselves and whether McCloud recognized them for who they were. Further, the court concluded the dispute is one of material fact, because the detectives' failure to identify themselves as they made their way through a dark house evidences not mere negligence, but recklessness, potentially justifying a jury finding that their eventual use of deadly force was not objectively reasonable. We disagree with both conclusions.

*Id*. at 913–14.

The Sixth Circuit found that the failure of the three witnesses to hear the announcements did not refute the detectives' testimony that they in fact made several such announcements. Rather, it simply establishes that the witnesses did not hear the announcements. *Id*. at 914.

In this case, four neighbors were watching television at the time of the incident. One neighbor was washing dishes in the kitchen. One neighbor had gone to bed. The final neighbor across the street had been inside her house just before hearing the shots, talking to her hard of

17

hearing husband who was watching television that he had not turned down when she entered. Even Sergeant Matter was focused on Mr. David and not Patrolman Lawson.  Thus, like the facts in *Chappell*, these statements only prove that the witnesses did not hear Patrolman Lawson.  The depositions from the neighbors do not prove that a statement had failed to be made.  The depositions simply establish that the neighbors heard nothing.  *Id*.  The statements do not rebut Patrolman Lawson's testimony or create a genuine issue of fact.  *Id*.

### F.  Alternative Actions Available to Officers

Plaintiffs' list of other actions which the officers could have performed, as noted by Police Chief Brandal's testimony, is the type of after-the-fact analysis which the Supreme Court has specifically prohibited.  The Court is required to evaluate the facts from the perspective of a reasonable officer on the scene making a split-second judgment under tense, uncertain, and rapidly evolving circumstances, without the advantage of hindsight.  *Graham*, 490 U.S. at 396–97.

Patrolman Lawson testified that he identified himself as a member of the Bellevue Police Department.  Sergeant Matter confirmed that he heard Patrolman Lawson speak, although he could not determine what was said.  Mr. David was observed aiming his weapon at Patrolman Lawson and the officers fired their weapons to protect themselves.  The Court finds a reasonable officer would find himself under immediate threat to his safety because:  1) Mr. David pointed his weapon at one of the officers; 2) the officers had prior information that the gun was potentially loaded; and 3) Mr. David's actions occurred after he was warned regarding the police presence. *See Martin v. City of Broadview Heights*, 712 F.3d 951, 958 (6th Cir. 2013).  The Court further finds under *Graham* that no Fourth Amendment violation occurred as the officers were faced with an uncertain, rapidly evolving situation, which called for a split-second decision.  *Graham*, 490

18

U.S. at 396–97.  Accordingly, Patrolman Lawson and Sergeant Matter are entitled to qualified immunity for their actions.

### G. Whether Mr. David Posed a Threat

Plaintiffs also argue that a genuine issue of fact exists as to whether Mr. David was a threat to the officers.  They note that under Ohio law, Mr. David had every right to be in possession of a firearm on his own front porch, citing Ohio Rev. Code § 2901.05(D)(2).  Plaintiffs allege that Mr. David lawfully possessed his firearm at the time of the incident.

It is immaterial whether Mr. David lawfully possessed a firearm at the time of the shooting.  The relevant question is what was the level of harm faced by the officers at the time the deadly force was used.

As Plaintiffs raise the issue, however, their own expert was of the opinion that Mr. David was not in lawful possession of the firearm as he was intoxicated at the time of the shooting.  (Doc. No. 103, Lyman Dep. at 48–49).  The officers did not approach Mr. David with the intent of arresting him for a weapon's violation.  Rather, the officers were investigating the allegations made by Mr. Armstrong against Mr. David.  (Doc. No. 100, Lawson Dep. at 166–68).

Plaintiffs next allege that the officers had no reason to believe Mr. David would have used his gun.  Their speculation does not change the fact that Mr. David aimed his gun at Patrolman Lawson.  It also does not prove the force used by the officers was unreasonable.  As admitted by their own expert,

> Q.  All right.  And certainly if someone, as has been testified to, is pointing a gun at you, you're going to presume they're about to shoot you?
>
> A.  I would, yes.

(Doc. No. 104, Balash Dep. at 58).

19

Mr. David had alternatives available to him if he was frightened as Plaintiffs suggest.  Mr. David could have gone into his house, an option Plaintiffs' expert states would have been his response.  (Doc. No. 103, Lyman Dep. at 63).  It is immaterial whether Mr. David intended to point a firearm at Patrolman Lawson, or thought he was pointing a gun at Mr. Armstrong.  What matters is that Mr. David aimed his gun at Patrolman Lawson.

### H.  Mr. David's Possession of Firearm

Plaintiffs rely on Mr. Balash's expert opinion to allege that there is a question of fact as to whether Mr. David was holding a firearm when the officers discharged their weapons.  Mr. Balash admitted, however, that the forensic evidence is consistent with Mr. David holding a firearm at the time of the shooting.  (Doc. No. 104, Balash Dep. at 152).  This conclusion is based upon the fact that there was an absence of blood in Mr. David's right hand and an absence of blood on the grip of the gun.  (Doc. No. 104, Balash Dep. at 151–52).  Although Mr. Balash stated that such a void of blood would also be consistent with Mr. David making a fist (Doc. No. 104, Balash Dep. at 152), there is no evidence that Mr. David ever made a fist during the incident.

Plaintiffs further allege the pattern of bullet strikes is not consistent with Mr. David standing, facing the officers, and pointing the weapon at the officers.  (Doc. No. 120, p. 14).  Mr. Balash testified the wound pattern was consistent with Mr. David being struck twice while standing, with the remaining wounds incurred while he was sitting or kneeling.  (Balash Dep. at 135–53).  A neighbor, who saw Mr. David immediately after the shooting, confirmed that Mr. David was facing the officers.  (Doc. No. 116, R. Paul Dep. at 16).  Further, six eyewitnesses interviewed by BCI confirmed that Mr. David was standing and aiming his gun at Patrolman Lawson when the officers began shooting.  (Doc. No. 120-3, p. 2).

20

### I.  Spoliation of Evidence

Plaintiffs allege that Sergeant Matter and Patrolman Lawson spoliated evidence when they removed the clip from Mr. David's gun and cleared it.  To succeed on a claim for spoliation, Plaintiffs must show that the destroyed evidence was relevant to their claims.  *Beaven v. United States Dep't of Justice*, 622 F.3d 540, 553 (6th Cir. 2010).  This allegation is irrelevant to Plaintiffs' claims.

It is undisputed that Mr. David's gun was preserved, available for testing, and was examined by Plaintiffs' expert.  Plaintiffs nonetheless contend that they are prejudiced as no one can show whether the safety on the firearm was on or off, or whether there was a round in the chamber of the gun.  (Doc. No. 120, p. 15).

These issues are entirely immaterial to determining whether Mr. David aimed the gun at Patrolman Lawson.  In evaluating the reasonableness of force used, courts "view the scene and activity from the perspective, then, of the reasonable police officer at the scene based on reports and information received and what he has observed."  *Boyd v. Baeppler*, 215 F.3d 594, 601 (6th Cir. 2000).  The officers knew that Mr. David had a firearm and that the firearm was aimed at Patrolman Lawson.  A witness told them that the firearm had been cocked and a round chambered in the gun.  The officers had no knowledge of whether the safety was on or whether the gun was loaded.  They did not have the luxury of time to investigate these matters, but responded when Mr. David aimed his firearm at Patrolman Lawson.

### J.  Existence of Firearm at Scene

21

Plaintiffs appear to be implying that the officers denied them the opportunity to confirm whether the gun was in fact at the scene during the shooting.  Neighbors confirmed that the officers only entered the house to escort Mrs. David out of the residence after the shooting.   (Doc. No. 116. R. Paul Dep. at 19; Doc. No. 117 A. Paul Dep. at 12–13; Doc. No. 119, C. Crecelius Dep. at 11).  Witnesses did not see the officers remove anything from the scene, or place anything at the scene.  (Doc. No. 116, R. Paul Dep. at 18; Doc. No. 117, A. Paul Dep. at 12-13; Doc. No. 118, K. Crecelius Dep. at 14).  Mrs. David confirmed that Mr. David had been in the bedroom, where the gun was kept, shortly before the incident.  (Doc. No. 105, K. David Dep. at 33, 38). The forensic evidence is consistent with Mr. David holding a firearm during the shooting.  (Doc. No. 104, Balash Dep. at 151–52).  Six independent witnesses saw Mr. David aim his gun at Patrolman Lawson.  All parties agree that the gun at issue belonged to Mr. David.  There is simply no evidence to infer that the officers misrepresented the fact that Mr. David had a gun at the time of the shooting.

As Plaintiffs cannot show that the officers destroyed any evidence that was relevant to their claims, they are not entitled to an adverse inference on the alleged spoliation.  Further, as the undisputed evidence shows that Mr. David pointed his gun at Patrolman Lawson, the officers' use of deadly force was reasonable.  *Graham*, 490 U.S. at 396–97.

### K.  Whether Number of Bullets Fired Constitutes Excessive Force

Plaintiffs allege that the officers fired an enormous number of bullets, constituting excessive force.  Plaintiffs cite to Mr. Balash's opinion that the majority of shots hit Mr. David when he was in a down position.  (Doc. No. 120, p. 18).  Mr. Balash testified that at a minimum, Mr. David was standing when two of the shots were fired, and that the remaining wounds were

22

incurred as Mr. David knelt on the porch. (Doc. No. 104, Balash Dep. at 135–53). Plaintiffs' experts admitted they could not determine the order the shots were fired, the reaction that Mr. David had to the shots being fired, or at what point in the sequence of firing that Mr. David knelt on the porch. (Doc. No. 103, Lyman Dep. at 87, 108; Doc. No. 104, Balash Dep. at 106–07, 156). The evidence does establish that Mr. David continued to hold the firearm until after the shooting had ceased.

Plaintiffs allege that the officers should have reassessed the situation after firing two rounds. Dr. Lyman admitted that he could not say with any certainty whether Mr. David's death would have been avoided had the officers fired two shots and reassessed the situation as Plaintiffs suggest. (Doc. No. 103, Lyman Dep. at 87). Moreover, Dr. Lyman admitted that his reassessment recommendation is just a guide and not a law enforcement standard. (Doc. No. 103, Lyman Dep. at 106).

Once an officer is justified in using deadly force, the officer may continue to use deadly force until the threat is abated. *Plumhoff v. Rickard*, 134 S. Ct. 2012, 2022 (2014). The continued use of force is reasonable when the threat continues, or there is a lack of evidence that the threat has ended. *Krause v. Jones*, 765 F.3d 675, 681 (6th Cir. 2014).

Patrolman Lawson and Sergeant Matter have consistently maintained that Mr. David aimed his pistol at Patrolman Lawson before they began shooting. Plaintiffs' expert confirmed that forensic evidence shows Mr. David was holding a firearm. Mr. Balash further confirmed that, at a minimum, Mr. David was standing for two wounds. An eye witness confirmed that Mr. David was facing the officers at the conclusion of the shooting, and six eyewitnesses confirmed that Mr. David aimed his weapon at Patrolman Lawson. Plaintiffs' experts cannot state the sequence of the

23

shots, which shot was the fatal shot, when during the incident that Mr. David went from standing to kneeling, or what Mr. David's reaction was to his wounds.  Witness testimony establishes that Mr. David continued to hold the firearm for the duration of the incident.

Under *Plumhoff* and *Krause*, the officers were entitled to continue to use force until the threat posed by Mr. David abated.  *Plumhoff*, 134 S. Ct. at 2022; *Krause*, 765 F.3d at 681.  There is no evidence that the officers used force after they believed Mr. David ceased to be a threat.  Given the facts, a reasonable officer in this situation would have believed the continued use of force complied with the parameters set forth in *Plumhoff* and *Krause*.  The officers are entitled to qualified immunity.

## VII.  City of Bellevue

The City of Bellevue is entitled to summary judgment regarding Plaintiffs' § 1983 claims.  A plaintiff raising a municipal liability claim under § 1983 must demonstrate that the alleged federal violation occurred because of a municipal policy or custom.  *Monell v. Dep't of Soc. Servs.,* 436 U.S. 658, 694 (1978).

A plaintiff can make a showing of an illegal policy or custom by demonstrating one of the following:  (1) the existence of an illegal official policy or legislative enactment; (2) that an official with final decision making authority ratified illegal actions; (3) the existence of a policy of inadequate training or supervision; or (4) the existence of a custom of tolerance or acquiescence of federal rights violations.

*Burgess v. Fischer*, 735 F.3d 462, 478 (6th Cir. 2013).

A municipality "may not be sued under § 1983 for an injury inflicted solely by its employees or agents."  *Monell,* 436 U.S. at 694.

### A.  *Failure to Investigate*

24

Plaintiffs contend that a municipality may be held liable under § 1983 where law enforcement officials ratified the conduct by failing to investigate the constitutional violations, citing *Marchese v. Lucas*, 758 F.2d 181, 188–89 (6th Cir. 1985).  Plaintiffs assert the city ratified the officers' actions because it relied upon the criminal investigation conducted by BCI rather than conducting its own investigation.

*Marchese* is inapplicable to this case.  As the Sixth Circuit explained, "Not only do the facts show that there was official toleration, (if not complicity in instigation) . . . there was also subsequent concealment followed by a complete failure to initiate and conduct any meaningful investigation on the part of the Sheriff himself."  *Marchese*, 758 F.2d at 187–88.  These facts do not exist in this case.  *Marchese* does not impose an obligation on municipalities to have immediate supervisors conduct an investigation.  The Bellevue Police actually went well beyond the facts of *Marchese* by requesting an independent state agency, in this case, the BCI, to investigate the shooting.  (Doc. No. 120-3, p. 2).  Further, the incident was reviewed by a state grand jury.  These investigations establish that the city did not ignore the situation and simply acquiesced to the officers' actions.

Nonetheless, Plaintiffs maintain that the city inadequately investigated the shooting.  Plaintiffs allege that the city improperly relied on BCI's investigation as it "was not adequate to determine what actually took place the night of Mr. David's death."  (Doc. No. 120, p. 21).  Despite this allegation, Plaintiffs do not identify how the BCI investigation was inadequate.

B.  *Adequacy of Investigation*

Plaintiffs correctly note that BCI's investigation evaluated whether criminal conduct occurred.  A necessary part of that determination included evaluating what happened surrounding the shooting.  Further, Police Chief Brandal did not blindly accept and adopt BCI's investigation as dispositive on the appropriateness of the officers' response.  Rather, he looked at the facts gathered by BCI and reviewed those facts against the city's policies to determine whether any violation occurred.  (Doc. No. 101, Brandal Dep. at 34–36).  BCI's investigation found that Mr. David pointed a gun at Patrolman Lawson and that Patrolman Lawson responded by using deadly force.  (Doc. No. 120-3, p. 2).  Plaintiffs' expert admits those facts show that the use of force complied with city policies and national standards.  (Doc. No. 103, Lyman Dep. at 100).  There is no evidence of an inadequate investigation sufficient to subject the city to *Monell* liability.

## VIII.  State Law Claims

Plaintiffs raise two supplemental state law claims.  They contend that the Defendants caused Mr. David pain and suffering, resulting in damages to the Plaintiffs pursuant to Ohio Rev. Code § 2125.02 (Count II).  They also allege that Patrolman Lawson and Sergeant Matter negligently inflicted emotional distress on Mrs. David (Count III).  Pursuant to 28 U.S.C. § 1367(c)(3), the Court declines to exercise supplemental jurisdiction over these state law claims as the Court "has dismissed all claims over which it has original jurisdiction . . . ." *See Musson Theatrical, Inc. v. Fed. Express Corp.*, 89 F.3d 1244, 1254–55 (6th Cir. 1996).  Therefore, Plaintiffs' state law claims are dismissed without prejudice.

## IX.  Conclusion

26

Accordingly, Defendants' motion to strike is denied.  (Doc. No. 124).  Defendants' motion for summary judgment is granted as to Plaintiffs' Fourth and Fourteenth Amendment rights, filed pursuant to § 1983.  Plaintiffs' supplemental state law claims are dismissed without prejudice.

IT IS SO ORDERED.

  S/ *David A. Katz*
DAVID A. KATZ
U. S. DISTRICT JUDGE